1  Cheryl A. Williams (Cal. Bar No. 193532)
   Kevin M. Cochrane (Cal. Bar No. 255266)
2  caw@williamscochrane.com
   kmc@williamscochrane.com
3  WILLIAMS & COCHRANE, LLP
   836 57th Street, Suite 472
4  Sacramento, CA 95819
   Telephone: (916) 431-0126
5
6  Attorneys for Plaintiff
   BERRY CREEK RANCHERIA
7
8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10
11 **BERRY CREEK RANCHERIA OF MAIDU**      Case No.:
   **INDIANS OF CALIFORNIA**, a federally-
12 recognized Indian tribe,                **COMPLAINT FOR FAILURE TO
                                           NEGOTIATE IN GOOD FAITH**
13              Plaintiff,
                                           **[INDIAN GAMING REGULATORY
14      vs.                                ACT – 25 U.S.C. § 2710(d)(7)(A)(i)]**

15 **STATE OF CALIFORNIA**; **GAVIN
   NEWSOM,** as Governor of the State of
16 California; and **DOES 1 THROUGH 10**;

17              Defendants.

18

19

20

21

22

23

24

25

26

27

28
                                                        Case No.: _____
                       COMPLAINT OF BERRY CREEK RANCHERIA

**INTRODUCTION**

1. The Berry Creek Rancheria of Maidu Indians of California ("Berry Creek" or "Tribe") brings this suit for bad faith negotiation against the State of California and Governor Gavin Newsom ("State") pursuant to the Indian Gaming Regulatory Act of 1988 ("IGRA"), 25 U.S.C. § 2701 *et seq*. Like the fourteen other Indian tribes who filed suit in this District over the last three years, Berry Creek is still a party to one of the original form class III gaming compacts in the State of California ("1999 Compact"), and has been involved in renegotiations of that agreement since February 2018. These renegotiations began after either the State or the United States Department of the Interior, as the case may be, approved "off-reservation" gaming proposals that would position tribes dissatisfied with their prior circumstances to cut off the patronage lines for Gold Country Casino, the modest gaming facility operated by Berry Creek. What followed over the course of the next three-and-a-half years was an abject failure by the State to engage in the individualized negotiations between two unique sovereigns that Congress envisioned when it enacted IGRA. *See* 134 Cong. Rec. 24024 (1988) (statement of Sen. Evans) (explaining "a compact should be a negotiation between two sovereigns" that "will need to consider, among other items, the experience and expertise of the particular tribe and State with gaming, and the existence of regulatory mechanisms within each government"). Rather, both the starting and ending points of the negotiations involved the State articulating its expectation that Berry Creek accept a compact recently executed by some other tribe, which in turn would limit – if not outright eliminate – what the State would actually have to negotiate. This in turn meant that the negotiation teams for both Governor Edmund G. Brown, Jr. and Governor Gavin Newsom refused to budge from their original positions after more than forty-four months of negotiation, insisting upon either including or excluding from the compact the following terms, amongst others:

a) Insisting upon the payment of revenue sharing fees into a Special Distribution Fund ("SDF") to cover State expenses that are not directly related to the regulation of Indian gaming, such as those meant to cover conducting years-long compact negotiations and defending bad faith suits arising therefrom, statewide general administrative expenses, and supplemental pension payments;

b) Insisting upon the payment of revenue sharing fees into a Revenue Sharing Trust Fund ("RSTF") above and beyond what is needed to fulfill the original purpose of the fund under the 1999

Compact of providing non- and limited-gaming tribes with $1.1 million in annual financial support;

c) Refusing to provide Berry Creek with any sort of enforceable form of exclusivity within the compact (or monetary remedy in the event exclusivity is breached) in order to justify the State's revenue sharing and other extraneous demands;

d) Insisting upon the inclusion of a provision that would require Berry Creek to enter into subordinate intergovernmental agreements ("MOUs") with localities and State agencies every time the Tribe undertakes a "Project" during the life of the compact – agreements that would require the payment of undefined yet provenly substantial sums of money, but nevertheless would not go before the Secretary of the Interior during the compact approval process so he or she can determine whether such payments, standing alone or in conjunction with the others required by the compact, are legal under IGRA;

e) Insisting upon the inclusion of a thirteen-page addendum containing State labor laws that is inaptly titled the Tribal Labor Relations Ordinance ("TLRO"), even though tribal gaming facilities are now subject to the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, and at least certain terms of the TLRO conflict with the NLRA and put tribes in a rather unfair position when dealing with labor unions;

f) Insisting upon riddling the compact with "violation" and "material breach" language that would allow the State to seek the termination of the compact for any number of reasons rather than a less draconian remedy that is more sensitive to and consistent with the continuing relationship created by IGRA;

g) Insisting upon the inclusion of a myriad of other regulatory provisions that both greatly encroach upon tribal sovereignty and greatly increase the costs of doing business, like by defining the "Gaming Facility" to include structures and areas other than the casino itself; imposing the State's minimum wage law; requiring the enforcement of the State's "earnings withholding orders for… support of a child, spouse or former spouse;" prohibiting the cashing of most governmental checks; and waiving the Tribe's sovereign immunity up to many, many millions of dollars in potential damages for both claims sounding in tort and those brought by employees for workplace discrimination, harassment, or retaliation; and,

h) Refusing to confine the State's regulations to the compact itself, which would thus enable the State Legislature to demand concessions outside of the compact in order to obtain the ratification of the agreement, or the State Gaming Agency to issue regulations and thus generally regulate Berry Creek's reservation-based gaming facility during the life of the agreement.

2. In addition to insisting upon a very specific set of terms it wants included in the compact, the State has also been unwilling to negotiate for new class III gaming rights that are permitted under IGRA. Berry Creek sought to obtain new gaming rights in order to cushion the foregoing blow from its new off-reservation competitors, specifically requesting that the State provide the forms of class III gaming that are available to the Tribe on account of either (1) the creation of the State Lottery and/or the tribes' right to "conduct… lottery games" in Sections 19(d) and 19(f), respectively, of Article IV of the California Constitution; (2) the non-banked games currently being offered at card rooms around the State on top of their standard card games; and (3) the statutory scheme pertaining to the State's nonprofit fundraiser program at California Business and Professions Code Sections 19985 through 19987. What more than forty-four months of negotiation and at least eight proposals on the subject revealed was that the State was not willing to negotiate for an entire form of class III gaming as IGRA requires. *See*, *e.g*., 25 U.S.C. § 2703(8); 25 C.F.R. § 502.4 (May 11, 1992). In fact, in a matryoshka-n doll kind of way, it would not even negotiate for a subform of that form, or a subform of the subform. After removing each successive-ly smaller potential concession, the State's ultimate position at the hollow core of this paradigm was that Berry Creek could only offer a specific game that some other private or public entity within the State of California had already put into commercial operation, almost always in an urban area. Thus, the anti-competitive position taken by the State on new gaming rights would make Berry Creek entirely depend-ent upon and constrained by the decisions of some other gambling enterprise, making it virtually impos-sible for the Tribe to use the lure of new games to draw potential patrons out to the remote reservation, and away from the local gas stations where they purchase lottery tickets or the neighborhood card rooms where they play Pai Gow tiles. With the June 30, 2022 expiration date of the 1999 Compact just half a year away, Berry Creek stuck with the negotiations long past the point of impasse to see if the State would abandon its oft-rejected legal position – one the federal courts have classified as turning IGRA into a "dead letter" (*see* ¶ 68, *infra*) – that it can "negotiate" a tribal compact by simply copying and

pasting existing state-law limitations. Yet, consistent with its behavior in this and other tribal negotiations, more time just brought more of the same.

## JURISDICTION AND VENUE

3. The district court has jurisdiction over this action pursuant to, *inter alia*, 25 U.S.C. § 2710(d)(7)(A)(i); 28 U.S.C. § 1331; and 28 U.S.C. § 1362.

4. The State has waived Eleventh Amendment immunity from suit in, *inter alia*, Cal. Gov't Code § 98005 and § 9.4(a) of the 1999 Compact.

5. Venue is proper in the United States District Court for the Eastern District of California under 28 U.S.C. § 1391(b) since Governor Gavin Newsom, his negotiator, his negotiation team, and his counsel are located in the Eastern District; Berry Creek is located in this District; counsel for Berry Creek is located in this District; a substantial part – if not all – of the events giving rise to the claims herein occurred in this District; and since this action is related to more than a dozen other suits brought by Indian tribes in this District challenging the State's dutifulness in negotiations arising out of 1999 Compacts.

6. This action presents an actual and live controversy as to whether the State negotiated in bad faith with Berry Creek under IGRA. The district court has the power to remedy this dispute in accordance with the Prayer for Relief, *infra*.

## PARTIES

7. The Berry Creek Rancheria of Maidu Indians of California is a federally-recognized Indian tribe located within the external boundaries of the State California that is listed in the January 29, 2021 Federal Register by such name.

8. Gavin Newsom is the current Governor of the State of California and Berry Creek brings this suit against him in his official capacity.

9. The State of California is the thirty-first sovereign state of the United States.

## GENERAL ALLEGATIONS

### I.   BACKGROUND ON IGRA

10. The Indian Gaming Regulatory Act of 1988 ("IGRA"), 25 U.S.C. § 2701 *et seq*., is a federal statute that sets forth the processes an Indian tribe must follow before it can engage in certain "classes" of gaming.

11. "Class III gaming" – the highest numerical class – is the most heavily-regulated of the class-es of gaming and generally encompasses the games typically associated with Las Vegas and Atlantic City casinos.

12. Before offering games that fall within this particular class of gaming, an Indian tribe must first execute a compact with the surrounding state that may contain the regulatory provisions pertaining to the operation of the games sought. *See* 25 U.S.C. § 2710(d)(1)(C).

13. According to IGRA, this process begins when the "Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall re-quest the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(3)(A). From there, "the State shall negotiate with the Indian tribe in good faith to enter into such a compact." *Id.*

14. Putting the general definition above aside, what specifically qualifies as a class III gaming activity is set forth in an earlier section of IGRA, which defines "class III gaming" as "all *forms* of gam-ing that are not class I gaming or class II gaming." 25 U.S.C. § 2703(8).

15. The various forms of class III gaming are not set forth in the text of the statute, but have been largely detailed in an interpretive regulation issued by the National Indian Gaming Commission ("NIGC") – the federal agency vested with the statutory power to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions of [IGRA]." 25 U.S.C. § 2706(b)(10); *see* 25 C.F.R. § 502.4. That regulation, issued just four years after the enactment of IGRA, expands on the definition set forth in the statute by explaining that "Class III gaming means all forms of gaming that are not class I gaming or class II gaming, including but not limited to:"

(a) Any house banking game, including but not limited to –

    (1) Card games, such as baccarat, chemin de fer, blackjack (21), and pai gow (if played as house banking game);

    (2) Casino games such as roulette, craps, and keno;

(b) Any slot machines as defined in 15 U.S.C. § 1171(a)(1) and electronic or electromechanical facsimiles of any game of chance;

(c) Any sports betting and parimutuel wagering, including but not limited to wagering on horse racing, dog racing or jai alai; or

(d) Lotteries.

25 C.F.R. § 502.4.

16. The federal courts have two different views of what a state must negotiate for if a tribe sends a request to negotiate over a particular form of class III gaming. *See Northern Arapaho Tribe v. Wyoming*, 389 F.3d 1308, 1311 (10th Cir. 2004) ("*Northern Arapaho*") (detailing the two approaches and holding that the State of Wyoming negotiated in bad faith under either). The more expansive view has been adopted by the United States Court of Appeals for the Second Circuit and a district court within the United States Court of Appeals for the Seventh Circuit, and requires a state to negotiate for *all* class III gaming if any form of it is legal within the state. *See id.* (citing *Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1031-32 (2d Cir. 1990) ("*Mashantucket*"); *Lac du Flambeau of Lake Superior Chippewa Indians v. Wisconsin*, 770 F. Supp. 480 (W.D. Wis. 1991)). The more restrictive approach adopted by the United States Court of Appeals for the Ninth Circuit requires a state to negotiate for a specific form of gaming if any incident of such is legal within the state. *See id.* (citing, *e.g.*, *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1257-58 (9th Cir. 1994); *Cheyenne River Sioux Tribe v. South Dakota*, 3 F.3d 273, 278-79 (8th Cir. 1993); and further explaining "[i]t is clear under Wyoming law that the state regulates, rather than prohibits, calcutta and parimutuel wagering… The state is therefore clearly required to conduct negotiations with the Tribe concerning the full gamut of calcutta and parimutuel wagering.").

17. Thus, the way the negotiative process is supposed to work under IGRA is that a tribe can either request to continue conducting an existing form of class III gaming or to commence conducting a new form of class III gaming, and the state then consequently agrees to negotiate in good faith to enter into a compact covering *at least* the requested forms of gaming. *See* 25 U.S.C. § 2710(d)(3)(A).

18. During the consequent negotiations, the state is allowed to raise the seven specific subjects of negotiation that are set forth within the text of IGRA:

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

COMPLAINT OF BERRY CREEK RANCHERIA

(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

(v) remedies for breach of contract;

(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii) any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C).

19. However, the good faith duty means there are a number of things that a state cannot do during the course of the negotiations, one prominent and historically-recurrent example of such is set forth within the text of IGRA and prohibits a state from attempting to "impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity." 25 U.S.C. § 2710(d)(4).

20. If the parties are able to successfully conclude a compact, the executed version of such is then sent to the Secretary of the Interior so he or she can review the terms and decide whether to approve the agreement – with notice of approval published in the Federal Register – or disapprove it for violating "(i) any provision of [IGRA]," including the prohibition on taxation set forth above, "(ii) any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or (iii) the trust obligations of the United States to Indians." 25 U.S.C. § 2710(d)(8)(B)(i)-(iii).

21. Conversely, if the parties are unable to conclude a compact for whatever reason, an Indian tribe has the statutory authorization to file a cause of action in federal district court "arising from the failure of the State… to conduct such [compact] negotiations in good faith." 25 U.S.C. § 2710(d)(7)(A)(i).

22. In the context of failed negotiations, an Indian tribe may invoke the court option after just one-hundred and eighty (180) days since the well-established "function of the good faith requirement… is to permit the tribe to process gaming arrangements on an expedited basis." *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1041 (9th Cir. 2010) ("*Rincon II*") (citing 25 U.S.C. § 2710(d)(7)(B)(i)).

23. When presenting the issue of good or bad faith to the court on a motion for judgment on the pleadings or during summary judgment, all a tribe has to do is "*[i]ntroduc[e]*… evidence" that "(I) a

Tribal-State compact has not been entered into… and (II) the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith." 25 U.S.C. § 2710(d)(7)(B)(ii). With the introduction of such evidence, "[t]he burden of proof shall be upon the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(7)(B)(ii); *see* 134 Cong. Rec. 25377 (1988) (explaining IGRA "imposes the burden of proof on the State in any court test").

24.  As for what is or is not bad faith, the federal courts have developed extensive jurisprudence on the subject over the last quarter of a century. Generally, a demand for "revenue sharing" above and beyond what is necessary to "defray the costs of regulating such activity" is bad faith unless the state has offered the tribe a meaningful concession in return. For instance, the State was able to obtain the heightened RSTF and SDF revenue sharing under the 1999 Compact because it supported Proposition 1A, a measure that amended the California Constitution and thereby gave tribes the "exclusive right to conduct class III gaming in the most populous state in the country." *In re Indian Gaming,* 331 F.3d 1094, 1114-15 (9th Cir. 2003) ("*Coyote Valley II*"). However, the true value of this concession has been called into question recently by an opinion from the Ninth Circuit that held tribes may have no way to actually enforce this exclusivity through their compacts since "California law does not permit the State to 'contract away its right to exercise its police powers.'" *Yocha Dehe Wintun Nation v. Newsom*, 830 F. App'x 549, 551 (9th Cir. 2020) (citing, *e.g.*, *Summit Media LLC v. City of Los Angeles*, 211 Cal. App. 4th 921, 934 (2012)). The same principle, though, of having meaningful concessions counterbalance demands applies to other types of revenue sharing as well, though certain ones like general fund revenue sharing are so repugnant to the purpose of IGRA that it is "difficult" for the Ninth Circuit to "imagine what concessions the State could offer to rebut the strong suggestion of bad faith arising from such demands." *Rincon II*, 602 F.3d at 1036.

25. The common law is just as if not more developed when it comes to detailing a state's obligations when negotiating a particular form of class III gaming requested by an Indian tribe. Out of these authorities come the principles below that a state cannot:

a) refuse or otherwise fail to negotiate (*see Mashantucket*, 913 F.3d at 1024);

b)  make an erroneous determination about the legality of a requested form of gaming (*see*

*Mashantucket*, 913 F.2d at 1032-33 ("The statutory terms are clear, and provide no exception for sincere but erroneous legal analyses."));

c) try to negotiate for only some portion of a requested form of gaming by, *inter alia*, insisting upon the same terms that apply to state or commercial actors when offering such within the state (*see Northern Arapaho*, 389 F.3d at 1313 ("When a state refuses to negotiate beyond state law limitations concerning a game that it permits, the state cannot be said to have negotiated in good faith under IGRA given the plain meaning of the statute."));

d) act in a protectionist manner (*see Coyote Valley II*, 331 F.3d at 1115 ("Congress did not intend to allow States to invoke their economic interests 'as justification… for excluding Indian tribes from' class III gaming; nor did Congress intend to permit States to use their compact requirement 'as a justification… for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes'" (quoting S. Rep. No. 100-446, 13 (1988)))); or,

e) engage in surface bargaining by, *inter alia*, failing to make "counter-proposals" or "counter-suggestions" to the demands of an Indian tribe with respect to a requested form of gaming (*see Flandreau Santee Sioux Tribe v. South Dakota*, 2011 U.S. Dist. Lexis 68531, *11 (D.S.D. 2011) (citing, *e.g.*, *NLRB v. George P. Pilling & Son Co.*, 119 F.2d 32, 37 (3d Cir. 1941) ("Agreement by way of compromise cannot be expected unless the one rejecting a claim or demand is willing to make counter-suggestion or proposal. And, where that is expressly invited but is refused, in such circumstances the refusal may go to support a want of good faith, and, hence, a refusal to bargain."))).

26. If a court finds that a state has failed to carry its burden to prove that it negotiated in good faith with an Indian tribe "to conclude a Tribal-State compact governing the conduct of [the requested] gaming activities," it then triggers a tripartite remedial scheme set forth within IGRA that begins with sixty (60) days of renewed negotiations between the parties. *See* 25 U.S.C. § 2710(d)(7)(B)(iii).

## II.   COMPACTING IN CALIFORNIA AND BERRY CREEK'S 1999 COMPACT

27. As part of the negotiations for the 1999 Compact, the people of the State of California approved a ballot measure known as Proposition 1A, the effect of which was to amend the California Constitution to include the language set forth below that would expressly enable Indian tribes to offer three discreet forms of class III gaming – slot machines, house banked card games, and lottery games:

(f) Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts.

Cal. Const. art. IV, § 19(f).

28. Curiously, the compact resulting from the foregoing negotiations, and the one Berry Creek executed, provided the tribes with the right to operate the first two forms of class III gaming *carte blanche*, but limited the grant of lottery games to just those "that are authorized under state law to the California State Lottery."

29. The California State Lottery was created under a prior subsection of the California Constitution, and the way in which it operates is that it amends its regulations to self-authorize any new games it wants to put into commercial operation. The most recent version of those regulations as of the date of this filing – *i.e.*, May 27, 2021 – includes a Section 3 that lays out the ten (10) specific lottery games the California State Lottery presently offers, with the respective subsections for each of these ten games beginning with an "Authorization" provision that uniformly states "[t]he California Lottery may conduct [insert name of game] pursuant to these rules and regulations."

30. Section 12 of the 1999 Compact describes the various ways in which the parties can modify the agreement through either amendments or renegotiations, with Section 12.2 therein stating that "[t]his Gaming Compact is subject to renegotiation in the event the Tribe wishes to engage in forms of Class III gaming other than those games authorized herein and requests renegotiation for that purpose."

31. Invoking this section, Berry Creek, through its legal counsel, sent the prior gubernatorial administration a letter dated February 7, 2018 in which the Tribe triggered renegotiations of the 1999 Compact so it could offer forms of class III gaming that were not authorized under the agreement either in whole or in part. This request to renegotiate the 1999 Compact came about as an attempt by Berry Creek to remain competitive in an increasingly saturated gaming market, one in which tribal competitors not just emerged in recent years but positioned themselves into better locations largely as a result of discretionary and divisive decisions by outside government officials.

32. For purposes of background, Berry Creek operated slot machines prior to the advent of the 1999 Compacts on September 1, 1999, and thus, unlike the majority of other tribes that signed on to this agreement, it had to effectively pay a penalty going forward by making quarterly contributions into the Special Distribution Fund according to a schedule that ranges from 0 to 13% of net win (*i.e.*, gross gaming revenues).

33. In 2003, Berry Creek turned the portables in which it was operating slot machines into a permanent gaming facility called Gold Country Casino, which is sited on the Tribe's trust lands just outside the eastern town limits of Oroville, California. Given that Oroville only had about 15,000 residents at the time, the viability of this new permanent facility depended upon the patronage of customers traveling along the twin north-south arteries designated as State Routes 70 and 99, with customers from the north largely coming from Chico and those from the south travelling from both Yuba City/Marysville and the northern portion of the Sacramento metropolitan area.



34. The only tribal competitor in the local gaming market present at the time was the Mooretown

COMPLAINT OF BERRY CREEK RANCHERIA

Rancheria of Maidu Indians of California ("Mooretown"), a tribe whose reservation is located just two-miles south/southwest of that for Berry Creek.



35. However, the advent of Indian gaming in California brought with it calculated efforts by other tribes in less desirable locations to try and exploit what are supposed to be "limited exceptions" in IGRA in order to leapfrog over other tribes and position themselves to dominate the northern California gaming market. *See Kalispel Tribe of Indians v. U.S. Dep't of Interior*, 999 F.3d 683, 688 (9th Cir. 2021) (describing the exceptions to IGRA's prohibition on gaming on after-acquired lands as "limited"). One such situation involves the Mechoopda Indian Tribe of the Chico Rancheria, California ("Mechoopda"), a tribe whose federal recognition was restored after the enactment of IGRA that sought and – in February 2014 – obtained the Secretary of the Interior's approval to take 626.55 acres of land into federal trust for gaming purposes under the "restored lands" exception in Section 2719(b)(1)(B)(iii) of the statute. *See* 25 U.S.C. § 2719(b)(1)(B)(iii) (describing one of the limited exceptions to the general prohibition on taking lands into trust for gaming purposes after the enactment date for IGRA as "lands are

1  taken into trust as part of – (iii) the restoration of lands for an Indian tribe that is restored to federal rec-

2  ognition").

3       36. The implementing regulations for IGRA's rather circumscribed provisions governing gaming

4  on after acquired lands surprisingly vest a tribe with broad latitude in selecting land to place into federal

5  trust if – like Mechoopda – its federal recognition "was restored by a Federal court determination in

6  which the United States is a party or by a court-approved settlement agreement entered into by the Unit-

7  ed States." 25 C.F.R. § 292.11(c). In such a situation, all the petitioning tribe must demonstrate in order

8  to show the requisite modern-day connection to the chosen land is that such land is either "within a rea-

9  sonable commuting distance of the tribe's existing reservation;" "near where a significant number of

10 tribal members reside" "if the tribe has no reservation;" "within a 25-mile radius of the tribe's headquar-

11 ters or other tribal governmental facilities that have existed at that location for at least 2 years at the time

12 of the application for land-into-trust;" or "[o]ther factors demonstrate the tribe's current connection to

13 the land." 25 C.F.R. § 292.12(a)(1)-(4). To provide an idea of the true laxity of this regulation (particu-

14 larly when applied in areas where towns or cities are closely clustered together), a restored tribe with an

15 office in Dixon, California could then claim a modern connection to land on the outskirts of Vallejo with

16 an eye on opening a megalithic gaming facility that caters to the entire Bay Area.

17      37. The 626.55 acres of land successfully placed into federal trust by Mechoopda that is des-

18 cribed in part as "lying easterly of U.S. Highway 99E" in the Federal Register notice announcing the ac-

19 quisition (*see* 79 Fed. Reg. 6917 (Feb. 5, 2014))  is actually depicted as being just off the State Route 99

20 and State Route 149 intersection according to Appendix A of the compact the tribe would subsequently

21 execute with the State in 2018.

22

23

24

25                                    **[CONTINUED ON NEXT PAGE]**

26

27

28

COMPLAINT OF BERRY CREEK RANCHERIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15 Thus, the handpicked location for Mechoopda's future gaming facility conveniently sits right at the turn-

16 off customers heading south from Chico normally take when traveling to Gold Country Casino.

17
18
19
20
21
22
23
24
25
26
27
28

**[CONTINUED ON NEXT PAGE]**



38. Another tribe that participated in this stratagem that many across California – including some very prominent public figures – have somewhat inartfully dubbed "reservation shopping" is the Enterprise Rancheria of Maidu Indians of California ("Enterprise"), which sought to place into federal trust rather distant lands that would allow it to operate a lucrative resort-style casino. *See*, *e.g.*, United States Senator for California Dianne Feinstein, *It's time to say "enough is enough" to reservation shopping* (Nov. 27, 2010), *available at* https://www.feinstein.senate.gov/public/index.cfm/op-eds?ID= 9DBBD6A6-5056-8059-7697-2F70FDB3EA5E (last visited Dec. 6, 2021).

39. The lands in Enterprise's historical possession were two 40-acre parcels near Enterprise, California, a former town that was situated alongside the then-existing boundaries of the southern fork of the Feather River. *See, e.g., Estom Yumeka Maidu Tribe of Enterprise Rancheria v. California*, 163 F. Supp. 3d 769, 772 (E.D. Cal. 2016) ("Enterprise"). The first of these two parcels that is commonly referred to as Enterprise 1 still exists, is still under the tribe's jurisdiction, and – at various points from 2009 to 2017 – has been described as being "10 miles east of Oroville," "located on a hillside above

COMPLAINT OF BERRY CREEK RANCHERIA

Lake Oroville," "accessed only by a dirt road," and in "a remote and sparsely populated area that is difficult to access." The other parcel that is known as Enterprise 2 was sold to the State of California in 1964 pursuant to Public Law 88-453 for the sum of $11,175 and subsequently submerged with the construction of the Oroville Dam and the consequent creation of Lake Oroville.



40. The fact that areas adjacent to a particular branch of the Feather River are the locus of the tribe's modern land holdings was of little consequence to Enterprise after the enactment of IGRA, as the tribe took note of the development of the Toyota Amphitheatre just south of Yuba City – some thirty-five miles away – and, in 2002, requested that the Secretary of the Interior take land near this new concert venue into trust for purposes of "off-reservation" gaming through the two-part-determination process set forth in Section 2719(b)(1)(A) of the statute. *See* 25 U.S.C. § 2719(b)(1)(A). The aptly-named two-part process only allows the Secretary of the Interior to take such off-reservation lands into trust for gaming purposes if he or she first "determines that a gaming establishment on newly-acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the

surrounding community," and then "the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination." *Id.*



41. On September 1, 2011, the Assistant Secretary for Indian Affairs Larry Echo Hawk, acting on behalf of the Secretary of the Interior, agreed to take the Yuba City parcel into trust for Enterprise, a decision Governor Edmund G. Brown, Jr. would then concur in on August 30, 2012 – the same date he also executed a compact with the tribe that would allow it to build a resort casino on the soon-to-be federalized land.

42. Contemporaneously, Governor Brown issued a similar concurrence for and executed a similar compact with the North Fork Rancheria of Mono Indians of California ("North Fork") that would enable this tribe to operate an "off-reservation" casino in Madera County, California.

43. These two discretionary decisions by Governor Brown that greenlit "off-reservation" gaming proposals sparked a flurry of public outcry.

44. Fortunately for it, North Fork was able to get its compact through the California Legislature

before the worst of the public backlash hit, with the compact being ratified in the midst of the 2013 legislative session.

45. On July 19, 2013, just weeks after the foregoing legislative ratification of North Fork's compact for the Madera parcel, the California Secretary of State issued a ballot summary for Proposition 48, a veto referendum that would ultimately appear on the ballot for the 2014 election and only uphold the assembly bill approving the foregoing compact – *i.e.*, Assembly Bill 277 – if the People of the State voted yes in favor of the referendum.

46. However, on November 4, 2014, the People of the State did the exact opposite, deciding by a vote of 60.96% to 39.04% to reject Assembly Bill 277, thus nullifying the legislative ratification for the North Fork compact.

47. The alacrity with which the North Fork compact moved through the legislative process was not shared by Enterprise, and the mere announcement of Proposition 48 in July 2013 chilled any further activity on the tribe's still-pending compact for the Yuba City parcel for the rest of the 2013 legislative session. Ultimately, the Enterprise compact expired according to its own terms on July 1, 2014.

48. All the expiration of this compact did was lead Enterprise to file a suit for bad faith negotiation against the State, claiming that the California Legislature's inactivity on the compact for the Yuba Parcel during the period of time in which the People of the State were determining whether off-reservation gaming should be allowed constituted bad faith negotiation. *See Enterprise*, 163 F. Supp. 3d 769. The tribe ultimately prevailed on its claim and has since constructed a 300,000 square foot resort casino that houses 1,600+ slot machines, which is known alternatively as Hard Rock Sacramento and the Hard Rock Hotel & Casino at Fire Mountain. *See* Hard Rock Hotel & Casino Sacramento at Fire Mountain, *Casino*, *available at* https://www.hardrockhotelsacramento.com/casino (last visited Dec. 6, 2021).

49. What this second "off-reservation" development means is that the major north-south thoroughfares that transport patrons from the nearest urban areas to Gold Country Casino are now poised to have much larger resort-style casinos – ones that came about in unexpected if not inequitable manners and will likely displace a substantial portion of the traditional customer base at Berry Creek's gaming facility.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15   50. The renegotiation request that counsel for Berry Creek sent to Governor Brown on February

16   7, 2018 raised the threat posed by "this upswell of formidable if not potentially destabilizing competition

17   in the local area" and tried to protect the continued profitability of a suddenly-encircled gaming facility

18   that has arguably paid way more revenue sharing that it should have over the past fifteen-plus years by

19   obtaining three new forms of gaming – which are not authorized either in whole or in part under the

20   1999 Compact – based upon three different laws or realities within the State.

21   51.  The first of these is Sections 19(d) and 19(f) of Article IV of the California Constitution that

22   created the California State Lottery and granted Indian tribes the right to offer lottery games, respective-

23   ly. *See* Cal. Const. art. IV, §§ 19(d) & 19(f).

24   52. Based upon these Constitutional provisions, Berry Creek requested the "right to offer lottery

25   games generally[] instead [of being] limit[ed]… to offering the ten or so particular games that the Cali-

26   fornia State Lottery has 'authorized' itself to offer at present."

27   53. The second of these arises from the fact that many of the seventy-four (74) or so card rooms

28

in the State of California commercially offer types of non-banked games other than card games that would qualify as class III gaming under IGRA. For instance, the Bicycle Casino in Los Angeles offers multiple tile-based games that include Pai Gow Tiles and variations thereof like Bonanza Pai Gow Tiles and Reverse Bet Pai Gow Tiles. *See* State of California Department of Justice, *Card Rooms List – The Bicycle Casino*, *available at* https://oag.ca.gov/gambling/cardroomlist (last visited June 4, 2021). The nearby Hawaiian Gardens casino that is also in Los Angeles likewise offers various iterations of Pai Gow tiles, while the Parkwest Casino in Sacramento offers not only Pai Gow but Mah-Jong as well. *See*, *e.g.*, State of California Department of Justice, *Card Rooms List – Parkwest Casino Lotus*, *available at* https://oag.ca.gov/gambling/cardroomlist (last visited June 4, 2021).

54. Based upon the card rooms operating these games (and doing so with the approval of the Department of Justice no less), Berry Creek requested the right to offer non-banked games that would be considered class III gaming under IGRA, and not just the specific tile games authorized by the Department of Justice for play at particular card rooms. For instance, the February 7th renegotiation request expressly discusses obtaining the right to "offer non-banked tile games in general" – including "Pai Gow, Mah Jong, and Tien Gow in particular" – and being able to offer such in the same manner as the cardrooms where, under the California Penal Code, the game at issue is not considered a banked game so long as, *inter alia*, "the published rules of the game feature a player-dealer position and provide that the position must be continually and systematically rotated amongst each of the participants during the play of the game." Cal. Penal Code § 330.11.

55. In a similar vein, the third of these arises from the enactment of a statutory scheme in the Business and Professions Code to permit the 72,000 or so nonprofits in the State of California to hold gambling-based fundraisers. *See* California Association of Nonprofits, *Causes Count – The Economic Power of California's Nonprofit Sector* p. 11, *available at* https://calnonprofits.org/images/downloads/causes-count-808.pdf (last visited June 4, 2021) (detailing the number and types of non-profits in California). On its website, the Department of Justice explains that the "comprehensive information pertaining to these types of fundraisers" is found in "Business and Professions Code sections 19985 through 19987." *See* State of California, Department of Justice, *Nonprofit Organization Gambling Fundraiser Registration Program*, *available at* https://oag.ca.gov/gambling/charitable (last visited June 4, 2020).

The indicated sections allow any established non-profit or chapter thereof to conduct annual fundraisers using "controlled games." *See, e.g.*, Cal. Bus. & Prof. Code § 19986(b), (e). With certain exceptions that are not material to this discussion, the term "controlled games" is defined in Section 337j(e)(1) of the Penal Code as "any poker or Pai Gow game, and any other game played with cards or tiles, or both, and approved by the Department of Justice, *and any game of chance*, including any gambling device, played for currency, check, credit, or any other thing of value *that is not prohibited and made unlawful by statute or local ordinance*." Cal. Penal Code § 337j(e)(1) (emphasis added). Obviously, the first and second clauses of the foregoing definition make tile games available to non-profits for use in their fundraisers. Moreover, the final catch-all clause permits any other type of gaming that is not prohibited by statute, with the principal section detailing such proscriptions being Section 330 of the Penal Code. *See* Cal. Penal Code § 330. That section lists a number of specific games and types of games that are prohibited within the State of California, but some games that are omitted from this proscription are non-banked card games (which has given rise to the card room industry) and non-banked dice games. *See id.*

56. Based upon the statutory scheme for nonprofit fundraisers, Berry Creek requested the right to offer class III gaming that would arise from the statutory definition of "controlled games," and not just the specific games authorized by the Department of Justice for play at particular fundraisers. For instance, the February 7th renegotiation request mentions the non-banked tile games discussed above and goes on to further request "the right to [offer] traditional non-banked dice games like Street Craps, Hazard, Cho-Han Bakuchi, Mexico, and Shut the Box." As with the request above arising from the activities at the card rooms, this one also refers to the Penal Code section distinguishing between banked and non-banked games and similarly requests the right to offer "controlled games" as non-banked games so long as, *inter alia*, "the published rules of the game feature a player-dealer position and provide that the position must be continually and systematically rotated amongst each of the participants during the play of the game." Cal. Penal Code § 330.11.

57. What transpired next is a pattern of obstruction by the State over the ensuing three-and-a-half years that can be broken down into four categories: confusion, conditions, continuances, and conflation. As to the first of these, the State initially tried to dodge negotiating for the new forms of gaming by having the negotiator appointed by Governor Brown – who happens to be an attorney – call the Chairman of

Berry Creek – who is not – and leave the voice mail transcribed below (which will be included as part of ther record of negotiations) in which he feigned confusion about the Tribe's negotiation requests and expressed a desire to speak with his counterpart one-on-one about the subject:

> Hi Chairman, this is Joe Dhillon from the Governor's Office. Just wanted to let you know we received a letter from your counsel. Uh, we'll prepare a response to you and to, uh, to them. Looking forward to, um, uh, meeting with you – that's what we'll propose in the letter – here in in, uh, Sacramento. Uh, the letter is not entirely clear as to the forms of gaming you are seeking to, um, uh to negotiate, uh, a compact for, so that's what we look forward to, to, um, meeting with you and talking about. If, if you would like to talk, please give me a call: 916-445-8612.

After he failed to receive a response, the negotiator for Governor Brown then followed up on this phone call with a letter to Berry Creek's Chairman on February 27, 2018 in which he explained the State "understands and accepts its obligation to negotiate," but nevertheless again claimed "the correspondence from [the Tribe's] counsel is not entirely clear regarding the specific forms of gaming that the Tribe seeks to address in compact negotiations and the legal basis for the Tribe's request for compact negotiations" – subjects he hoped to discuss at the first meeting between the parties that was set for March 9, 2018 in the hopes they could "resolve the uncertainty and *potentially* agree upon a path forward."

58. When these claims of confusion failed to forestall the negotiations at the March 18th meeting, the State took a different tack, using the pretense that the Governor was leaving office at the end of the year to justify its position that it would only negotiate with Berry Creek if the Tribe was willing to accept a compact executed by another tribe the prior year – the "Dry Creek" compact – with just minor revisions. The State was so adamant in its position that its legal counsel Sara Drake actually drafted the agreement below at the second meeting between the parties on April 11, 2018, with the negotiator for Governor Brown insisting that Berry Creek agree to its terms in order for the negotiations to continue:

> The State having informed Berry Creek that despite the State's position that it has no obligation to negotiate with the Tribe pursuant to section 12.1 of the existing compact between the State and the Tribe, in light of the time remaining in Governor Brown's administration and before the last legislative session during his administration requires that an endorsed compact be submitted to the Legislature for ratification as required by California's constitution by no later than August 1, 2018, the Tribe and the State agree to enter into negotiations under Compact section 12.1 and further agree that the only way a compact can be realistically negotiated to conclusion within the remaining time is upon the following conditions:

> The Tribe will negotiate using the language of a California compact that has been

approved by the Secretary of the Interior during and since 2017 and make minor modifications to that compact to make it unique to the Berry Creek Tribe except for the following provisions that the State and the Tribe agree to negotiate:

(a)     Number of Gaming Devices and revenue sharing provisions for the number of Gaming Devices consistent with other compacts between the State and California tribes negotiated within the last two years.

(b)     MOU requirements outside the requirements of the environmental intergovern-mental agreement required for a Project constructed under the terms of a new compact.

(c)     Off-track wagering.

(d)     Renegotiation provisions specific to additional Gaming Facilities and number of Gaming Devices and revenue sharing provisions tied to any increase.

(e)     Non-material edits to other compact provisions including edits similar to those the Tribe's attorneys drafted in compact negotiations with the State in the past.

Note, the inclusion of off-track wagering in subsection (c) of the State's agreement was a convenient substitute chosen by the State to create the appearance that it would negotiate for some new type of gaming – an arguably unprofitable one that Berry Creek had neither requested nor expressed an interest in – when it had already refused to negotiate for those set forth in the Tribe's original February 7th renegotiation request.

59. Facing a stark dilemma between some negotiations or no negotiations at all led counsel for Berry Creek to accept the conditions imposed by the State since it was the only way to move the negotiations forward.

60. However, it would not be long before the State breached the very terms of its own agreement. Though it took the position that Berry Creek had to use the Dry Creek compact as a template from which it would negotiate very minimal revisions, the State – through its legal counsel Sara Drake – sent an e-mail attaching a revised draft compact on June 20, 2018 in which it explained the Dry Creek compact contained some "unique provisions… based upon [that tribe's] extensive agreement with Sonoma County" and, therefore, "it was necessary to make certain additional revisions to [Berry Creek's] version of that compact," like by bolstering the MOU provisions of Section 11 of the agreement (*see* ¶¶ 80-83).

61. Seeing the State go back on its word put an unexpected chill on the negotiations during the summer of 2018, and though the negotiator for Governor Brown had taken the position that he would continue to negotiate throughout the fall, he unexpectedly reversed course when the time came by ex-

plaining in a much-belated October 30, 2018 e-mail that "it makes little sense to actively negotiate towards an agreement that the parties will not be able to conclude and present to the Legislature for ratification until after a new administration is in place." While the negotiator for Governor Brown offered to arrange a brief meeting with the incoming administration later in the fall to ensure a "smooth transition," the desired smoothness was seemingly geared towards the Brown Administration "review[ing] the status of negotiations" with the next administration in person and communicating the limitations it had imposed on the "scope of the negotiations" in order to continue to restrict the process to just the "specific issues [supposedly] of interest to Berry Creek."

62. The transition meeting never came to fruition, but the Newsom administration quickly learned about the prior administration's forced agreement, and told counsel for Berry Creek in the first substantive e-mail from the new negotiator on April 5, 2019 that "the State would like to begin the upcoming meeting [between the parties] with a discussion on the scope going forward, in light of the limiting conditions drafted at the April 11th meeting to which the Tribe agreed on April 13, 2018."

63. A confounding factor for the State in carrying out this plan was that the dog days of the 1999 Compact negotiations produced a last minute addition to the agreement – called Modification No. 4 – that requires the State to negotiate without condition eighteen months before the initial expiration date of December 31, 2020 – or just two and a half months *after* the date on which the negotiator for Governor Newsom sent her e-mail. With this in mind, counsel for Berry Creek sent a response e-mail to the State on April 23, 2019 in which it raised Modification 4 and explained – to the extent the "agreement" was even valid – the State could either negotiate without limitation now or simply wait for the discussions to "open up [to] other topics as of June 30, 2019."

64. The realization that it now had to at least superficially appear to consider the new forms of gaming simply led the State to switch tactics and bide its time for the next fifteen months until it executed a compact with the nearby Mooretown tribe. To explain, the first draft compact that Berry Creek sent to the Newsom administration on July 16, 20219 did not receive a response from the State until more than five months later (*i.e.*, December 20, 2019), and was then set for discussion at a subsequent negotiation session that would take place some two months after that (*i.e.*, February 13, 2020). When the time finally came, the predominant focus of the negotiation session was the State's insistence that the

parties hash out preliminary negotiation protocols pertaining to such inconsequential topics as how fu-ture sessions would be recorded and whom could attend.

65. When the Mooretown compact became public on August 4, 2020, the State reverted back to a tactic of the prior administration and used this new compact – in lieu of the one for the more distant Dry Creek tribe – as a yardstick for Berry Creek, explaining time and time again that it wanted the Tribe to accept the entire agreement (which lacked any of the requested new forms of gaming) without revision. It employed this negotiation tactic *again* despite the fact that compact negotiations are supposed to be an individualized process between two unique sovereigns. *See* 134 Cong. Rec. 24024 (1988) (statement of Sen. Evans) (explaining "a compact should be a negotiation between two sovereigns" that "will need to consider, among other items, the experience and expertise of the particular tribe and State with gaming, and the existence of regulatory mechanisms within each government"). Nevertheless, this hope and ex-pectation of the State that Berry Creek would accept some other tribe's compact was even memorialized in a draft compact sent on March 12, 2021, which contains two different comments from the State's negotiation team asserting variations of "as stated at the last meeting, the State would be willing to offer Berry Creek the exact same compact as Mooretown, but the whole compact as a package including all of the terms and provisions in the Mooretown compact." What is more, the negotiations from that point forward would involve a tit for tat whereby whatever the State "gave" Berry Creek above and beyond the Mooretown compact would then be offset by the State either stripping away a benefit or imposing a new burden. As just one example, any progress Berry Creek made on the subject of new forms of gam-ing incurred reprisals from the State in the form of higher revenue sharing obligations *even though* it has long been the law under IGRA that the State cannot even demand revenue sharing in the first place for simply providing basic gaming rights. *See, e.g., Rincon II,* 602 F.3d at 1031 n.12, 1039, 1040 ("IGRA entitles tribes to negotiate for basic class III gaming rights without being forced to accept revenue sharing."). Not to mention, any coyness from the State about its intentions was completely absent, as the negotiator for Governor Newsom admitted during a May 26, 2021 negotiation session that "the State did not offer the Tribe to have the Mooretown economic terms solely" but "the Mooretown compact as a whole," and thus any additional requests – like those pertaining to the new forms of gaming that spurred the negotiations – would result in the State "adjusting the Mooretown compact economic terms."

66. This staunch adherence to the Mooretown compact meant the State was intractable in negotiations over the core issues that launched the negotiations – revenue sharing and gaming rights. Each and every economic proposal Berry Creek advanced to try and assuage the harms posed by Mechoopda and the Enterprise off-reservation casino was rejected by the State out of hand without any sort of counter-proposal. As to that, across a variety of draft compacts, Berry Creek offered numerous different revenue sharing structures that tried to account for two tribal competitors positioning themselves (one with the State's express help) to cut off patronage lines – one in specific would redirect a portion of Enterprise's SDF contributions to Berry Creek while another would simply eliminate the Tribe's SDF payments on a certain threshold number of machines. This latter proposal seemed especially appropriate given that Berry Creek has been paying excess monies into the SDF for the past fifteen years now. However, all of the proposals from Berry Creek fell on deaf ears, as the State would not even engage in a meaningful discussion about Enterprise's two-part determination let alone consider ways to rectify the harms imparted by the resultant off-reservation Hard Rock casino.

67. On the subject of lottery games, the parties exchanged proposals on the subject eight times once the State abandoned its approximately year-and-a-half abstention from negotiating on the subject – on February 6, 2018; January 1, 2021; May 15, 2021; June 29, 2021; June 30, 2021; August 17, 2021; October 12, 2021; and October 15, 2021. Additionally, in-depth discussions regarding the various lottery games proposals occurred at negotiation sessions held on January 8, 2021; May 26, 2021; July 9, 2021; and September 10, 2021. Despite all of this, the final position taken by the State was vastly different from the one in the Pauma tribe's negotiations, but nevertheless had the same result of failing to confer anything at all. To explain, in Pauma, the position taken by the State over the course of many years of negotiation was that it would only agree to enumerate certain unidentified lottery games (other than the multi-state lottery games that could conceivably compete with the California State Lottery) in the body of the draft compact. *See Pauma Band of Mission Indians v. Newsom*, No. 21-01166-AWI-SKO, Dkt. No. 1, ¶¶ 2, 32 & 40 (E.D. Cal. June 30, 2021). This requirement for so-called granular specificity had suddenly become anathema to the State in Berry Creek's negotiations, as it flatly rejected the idea of identifying particular games in favor of inserting a provision that would allow Berry Creek to offer a proposed lottery game only if the State Gaming Agency approved its operation at some open-ended

point during the life of the compact after "taking into consideration whether they are [sic] a lottery under applicable California law and relevant case law" and whether "the rules of the game and any software or hardware computer equipment, drawing equipment and lottery tickets required for operation of such game make it possible to operate such game in a manner which is honest, fair to patrons and amenable to regulatory oversight." This entirely discretionary provision was a source of considerable consternation given that the Office of the Governor *had been* consulting with the State Gaming Agency on the lottery games topic for much of the negotiations and the agency *after many years* could still not identify a single game that satisfied the above standard and was thus fit for inclusion in the compact. Counsel for Berry Creek tried its hardest to work within the parameters of the State's proposal by suggesting revisions that would give the language some actual meaning, such as by including a time restriction upon the State Gaming Agency's considerations and/or remedies in the event of inaction or an unreasonable determination. Yet, none of this was acceptable to the State, and the very most it would do on the lottery games topic was rewind history and condition the Tribe's rights upon a State agency dutifully performing a discretionary power under the compact. *Cf. Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 629 F. Supp. 2d 1091 (E.D. Cal. 2009), *aff'd* 618 F.3d 1066 (9th Cir. 2010) (explaining the State Gaming Agency misrepresented a formula in the 1999 Compact and accordingly suppressed the number of slot machine licenses available to the signatory tribes by 20%, which took upwards of twelve years of litigation to correct).

68. On the subject of non-banked games and other controlled games made permissible by the card rooms and non-profit fundraisers, the parties exchanged proposals on the subject eight times once the State abandoned its approximately year-and-a-half abstention from negotiating on the subject – on February 6, 2018; January 1, 2021; May 15, 2021; June 29, 2021; June 30, 2021; August 17, 2021; October 12, 2021; and October 15, 2021. Additionally, in-depth discussions on the various "controlled games" proposals occurred at negotiation sessions held on January 8, 2021; May 26, 2021; July 9, 2021; and September 10, 2021. Despite all of this, the final position taken by the State – one it stood by even though it acknowledged at the July 9, 2021 negotiation session that the Tribe has the right to offer any "controlled games" as the term is defined by statute – was that it would only allow Berry Creek to offer the particular games "that have been [previously] approved by the State Gaming Agency to be played by

a nonprofit organization to conduct a fundraiser or in state gambling establishments pursuant to the Gambling Control Act, California Business and Professions Code section 19800 et seq., provided that those games are operated in accordance with state law." In other words, this proposal that would always leave Berry Creek one step behind its urban competition may allow the Tribe to offer a particular game like Pai Gow tiles since it is being offered for play at the Bicycle Casino in Los Angeles, but it would *not* allow for non-banked tile games more generally or other controlled games that are statutorily authorized but have not been administratively approved. *See* State of California Department of Justice, *Card Rooms List – The Bicycle Casino*, *available at* https://oag.ca.gov/gambling/cardroomlist (last visited June 4, 2021). Significant debate about the contours of IGRA's good faith requirement failed to produce any change in the State's position, even when Berry Creek raised the *Northern Arapaho* opinion and the holding therein that a state acts in bad faith if it is only willing to negotiate according to "state law limitations concerning a game that it permits." *Northern Arapaho*, 390 F.3d at 1313; *see id.* at 1312 ("If the state's approach were correct, however, 'the compact process that Congress established as the centerpiece of the IGRA's regulation of class III gaming would thus become a dead letter; there would be nothing to negotiate, and no meaningful compact would be possible.'" (citing *Mashantucket*, 913 F.2d at 1031)).

69. The close of the negotiations occurred shortly after the State sent the best compact it was willing to offer after more than three-and-a-half years of negotiation on October 12, 2021. Just a few days later, on October 15, 2021, Berry Creek responded with one final counterproposal, asking the State to indicate by a date certain whether it would accept a compact that contained numerous material redlines it had previously rejected – often repeatedly. On October 29, 2021, the negotiator for Governor Newsom sent an e-mail in which he concluded without hesitation or equivocation that the State "cannot agree to accept the Tribe's October 15 draft compact as the parties' final agreement" because it "includes provisions… [that] violate state or federal laws" – like those "authoriz[ing] the Tribe to offer multi-state lottery games" – and contains "other provisions [not even worthy of identification]… that are unacceptable to the State because they appear unlawful or do not promote good public policy." This would be the last communication Berry Creek received from the State as of the filing date for this Complaint.

**III.   THE REGULATORY TERMS THE STATE EITHER INSISTED UPON OR REFUSED TO NEGOTIATE**

70. This final compact offer transmitted by Berry Creek to the State on October 15th not only took issue with (and offered final counterproposals to) the State's positions on the new forms of class III gaming requested by the Tribe, but also the regulatory terms the State had unflinchingly insisted upon for the prior three-and-a-half years of negotiation. Some of the more significant of these are set forth below.

### ILLEGAL TAXATION (SDF)

71. From the inception of the negotiations, the State has insisted that Berry Creek pay revenue sharing into a State-administered fund created under the 1999 Compact called the SDF to cover what the State labels its "25 U.S.C. § 2710(d)(3)(C) costs incurred for purposes consistent with IGRA." For reference sake, Section 2710(d)(3)(C) of IGRA allows the state to negotiate compact "provisions relating to – (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity." 25 U.S.C. § 2710(d)(3)(C).

72. And yet, the provision insisted upon by the State goes much further than Section 2710(d)(3)(C) allows by requiring Berry Creek to cover costs associated with subjects that are either unrelated or antithetical to the purpose of IGRA, like "statewide general administrative expenses," "supplemental pension payments," and the salaries, benefits, and expenses incurred by the employees of the Indian and Gaming Law section of the California Department of Justice, regardless of the work being performed. What this last point means is that *tribes* are paying for the *State* to conduct yearslong compact negotiations and/or defend bad faith suits, which removes any financial disincentive to negotiating lackadaisically, obstinately defending disputes that should be settled, or engaging in measured and sophisticated forms of bad faith.

73. By insisting upon the payment of fees beyond that which are necessary to defray the State's actual and reasonable costs of regulating under the compact, the State has tried to impose a tax, fee, charge, or other assessment on Berry Creek in violation of IGRA, and thus failed to negotiate in good faith.

### ILLEGAL TAXATION (RSTF)

74. From the inception of the negotiations, the State has insisted that Berry Creek pay revenue

1   sharing into a State-administered fund created under the 1999 Compact called the RSTF, the original

2   purpose of which was to provide each non- and limited-gaming tribe with $1.1 million in annual finan-

3   cial support.

4       75. And yet, the provision insisted upon by the State goes much further than this by earmarking

5   such revenue sharing for a second fund called the Tribal Nations Grant Fund, an arguably politicized

6   fund through which the State or State-appointees award discretionary grants (not fixed sums) to Indian

7   tribes of their choosing for purposes of their choosing, instead of Berry Creek doing the same or devot-

8   ing such monies to its own local community in order to better the quality of life for its members and

9   neighbors. To help explain the problem with this, twice within the past four years, the Oroville area suf-

10   fered through supposedly "historic" or "generational" wildfires that burned large swaths of land just out-

11   side the town limits. In 2018, the Camp Fire, then the deadliest and most destructive wildfire in Cali-

12   fornia history, raged so close to Berry Creek that the Reservation had to be evacuated. Between this, the

13   2017 failure of the Oroville Dam, and the chronic water shortages that plague this portion of northern

14   California, Berry Creek took the position that any monies demanded by the State through the RSTF pro-

15   vision that the State could not prove were necessary to help keep this fund – and just this fund (not the

16   TNGF) – solvent should be exclusively devoted to water conservation and wildfire prevention efforts in

17   the local area. Both surprisingly and unfortunately, this idea failed to gain any meaningful traction with

18   the State.

19       76. By insisting upon the payment of fees beyond that which are necessary to provide non- and

20   limited-gaming tribes with $1.1 million in annual financial support, the State has tried to impose a tax,

21   fee, charge, or other assessment on Berry Creek in violation of IGRA, and thus failed to negotiate in

22   good faith.

23       **REFUSING TO NEGOTIATE FOR AN ENFORCEABLE FORM OF EXCLUSIVITY**

24       77. According to the Ninth Circuit, the only reason the State is able to receive RSTF and SDF

25   revenue sharing under the 1999 Compact is because it supported Proposition 1A, and thus "in exchange"

26   for its financial demands gave tribes "an exclusive right to conduct class III gaming in the most popu-

27   lous State in the country." *Coyote Valley II*, 331 F.3d at 1114-15.

28       78. This consideration of exclusivity was expended in connection with executing the 1999 Com-

pacts, and thus the State needs to offer something different in order to support these revenue sharing demands. *See Rincon II*, 602 F.3d at 1037 ("[I]n the current legal landscape, 'exclusivity' is not a new consideration the State can offer in negotiations because the tribe already fully enjoys that right as a matter of state constitutional law. Moreover, the benefits conferred by Proposition 1A have already been used as consideration for the establishment of the RSTF and SDF in the 1999 Compact. … 'It is elementary law that giving a party something to which he already has an absolute right is not consideration to support that party's contractual promise.'" (citations omitted)). But, it has failed to do that. Not only that, but the Ninth Circuit recently revealed that the exclusivity created through Proposition 1A may be of significantly less value than originally thought since the current compacts do not appear to provide a way of enforcing it. *See Yocha Dehe Wintun Nation*, 830 F. App'x at 551. In an attempt to rectify this, Berry Creek proposed redlines that would give Constitutional exclusivity some teeth by either allowing the Tribe to enjoin the licensure of any new non-tribal entrants into the class III gaming field or to require the State to pay damages if it repeals exclusivity during the life of the compact (which, in reality, just applies the existing waiver of sovereign immunity in Section 98005 of the Government Code that the State is trying to eliminate under the compact). However, the State rejected or ignored any and all redlines Berry Creek proposed on the subject of devising an enforceable form of exclusivity.

79. By refusing to consider any of Berry Creek's redlines that would provide the Tribe with an enforceable form of exclusivity, the State has both directly acted in bad faith and indirectly acted in bad faith by insisting upon revenue sharing without providing the underlying consideration necessary to obtain it.

## THE MOU REQUIREMENT

80. From the inception of the negotiations, the State has insisted that Berry Creek execute MOUs with the County of Butte and the California Department of Transportation every time the Tribe undertakes a "Project" during the life of the compact so as to both mitigate the alleged adverse environmental effects of such and also pay "[c]ompensation for law enforcement, fire protection, emergency medical services and any other public services to be provided by the County… as a consequence of the Project," for the "[m]itigation of any effect on public safety attributable to the Project," and for the "mitigation of all traffic impacts on the state highway system and facilities attributable to the Project."

81. Fortunately, Berry Creek has some knowledge of the financial burden imposed by this MOU requirement given the disclosures of other tribes. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155 (9th Cir. 2015). For instance, the Pauma tribe was tricked into executing an amended compact with the State that contained a substantively-identical MOU provision – one that consequently resulted in the tribe executing a MOU with the County of San Diego that would have required, *inter alia*, $38 million in road improvements, $400,000 annually for sheriff support, $200,000 annually for programs designed to address gambling addiction, $40,000 annually for the prosecution of Indian-gaming-related crimes, the construction of a state-of-the-art wastewater treatment plant, and the construction and staffing of an eleven-person and three-engine fire department. In northern California, the Federated Indians of Graton Rancheria likewise had to execute a MOU with the County of Sonoma and that agreement required recurring mitigation payments of $3,100,000 per annum to mitigate impacts of the "[p]roject" on social justice issues; $6000,000 per annum to "mitigate Health, Human Services, and socioeconomic impacts;" $1,790,000 per annum in development fees; $1,000,000 per annum for fire and emergency services; $416,918 per annum for the mitigation of crime impacts; $700,000 per annum for displaced county transient occupancy taxes; $500,000 per annum to mitigate the impacts on local roads; $2,000,000 per annum for other road improvements; $275,000 per annum for source water and to support water conservation programs; and *at least* another $3,630,000 in non-recurring payments (with the actual total potentially reaching into the hundreds of millions).

82. Not only that, but IGRA is written such that the Secretary of the Interior carries out the federal government's trust obligations towards Indian tribes by reviewing compacts – and especially the financial terms therein – immediately following execution to make sure they comply with IGRA, other federal laws, and the aforesaid "trust obligations of the United States to Indians." 25 U.S.C. § 2710(d)(8)(B). These MOUs are structured, however, to evade the Secretarial review process created by Congress because they are only generally and vaguely described in the compact itself, with the actual agreements not coming into existence until long after the compact has been approved.

83. By insisting upon the payment of substantial fees that are structured in such a way so as to avoid Secretarial review, the State has both tried to impose a tax, fee, charge, or other assessment on Berry Creek as well as violate the compacting process that Congress designed in IGRA, and thus, for

1   either reason, has failed to negotiate in good faith.

2   **THE TLRO REQUIREMENT**

3   84. From the inception of the negotiations, the State has insisted upon including in the compact

4   thirteen (13) pages of State-based labor laws that is has labelled with the misnomer the Tribal Labor

5   Relations Ordinance.

6   85. During the negotiations for the 1999 Compact, then-Governor Gray Davis demanded that

7   Indian tribes sit down with certain prominent and politically-influential labor unions and devise a

8   watered-down version of the modern-day TLRO specifically because the NLRA did not apply to the on-

9   reservation commercial enterprises of Indian tribes at the time. *See Coyote Valley II*, 331 F.3d at 1116;

10  *Fort Apache Timber Co.*, 226 N.L.R.B. 503 (1976). However, all of this changed in early 2007 when a

11  federal circuit court applied the NLRA to a tribal gaming facility located on the outskirts of Los Angel-

12  es. *See San Manuel Indian Bingo & Casino v. NLRB*, 475 F.3d 1306 (D.C. Cir. 2007). Since then, Indian

13  tribes in California have been expected to somehow comply with *both* the TLRO and the NLRA even

14  though there is inherent tension between these two sets of authorities. One example of this is the "bind-

15  ing dispute resolution" provision of the TLRO that states "[a]ll [labor] issues shall be resolved exclu-

16  sively through the binding dispute resolution mechanism herein." The tribal employer is held to this ar-

17  bitration requirement. Labor unions that contend they are not parties to the compact, on the other hand,

18  are not, and ultimately forum shop based upon their objectives. For instance, a labor union intent on

19  waging a "corporate campaign" will file one unfair labor practice charge after the next with the National

20  Labor Relations Board ("NLRB") in the hopes of financially coercing a tribe to execute a collective bar-

21  gaining agreement, irrespective of what its employees actually want. On the other hand, a labor union

22  hoping for either a quick decision or a less visible forum in which to raise specious issues will instead

23  cast aside the standing defense and invoke the arbitration process of the TLRO. *See UNITE HERE Local*

24  *30 v. Sycuan Band of Kumeyaay Nation*, No. 20-01006-W-DEB, Dkt. No. 1 (S.D. Cal. June 1, 2020).

25  This is but one problem created by the overlapping sets of authorities, and it causes tribes considerable

26  strife in trying to handle the often competing interests of labor unions and the casino workforce. What is

27  more, Indian tribes in the State have thus far been unsuccessful in convincing a federal court to address

28  the compatibility of the NLRA and the TLRO. *See Unite Here Local 30 v. Sycuan Band of Kumeyaay*

*Nation*, 2020 U.S. Dist. Lexis 232445 (S.D. Cal. Dec. 10, 2020) ("[T]he Court declines to exercise supplemental jurisdiction over the Tribe's counterclaim, which requests a declaration that the contract is void due to preemption of the TLRO by the NLRA."). What this means is that perhaps the only way to address this issue is prospectively, by having a federal court hold that the State negotiated in bad faith by demanding the TLRO at a point in time when the NLRA already applies.

86. By insisting upon the adoption of a rigorous and often conflicting set of State labor laws at a point in time that the NLRA applies to the gaming facilities of Indian tribes, the State has failed to negotiate in good faith.

**VIOLATION/MATERIAL BREACH LANGUAGE**

87. From the inception of the negotiations, the State has insisted upon riddling the draft compact with one-sided language of "violations" and "material breach[es]." According to the compact, one or the other of these things occurs if there is any failure by Berry Creek to make timely revenue sharing payments, "to remedy within a reasonable period of time any material and timely raised [building code] deficiency," "to correct all deficiencies identified in a [fire and life safety inspection] report within a reasonable period of time," to comply with "public health standards for food and beverage handling," to comply with "federal water quality and safe drinking water standards applicable in California," to prepare an environmental impact report in connection with any Project that – in the State's estimation – satisfies the requirements of the compact, or to adopt a tribal ordinance governing the procedures for handling the harassment, retaliation or employment discrimination claims by employees that are supposed to be dealt with through insurance (*see* ¶ 96(c)).

88. However, any deviation from the requisite standards does not simply empower the State to asses an appropriate fine against the Tribe or to seek some narrowly-tailored injunctive relief in order to remedy the perceived deficiency. Rather, the compact contains material breach provisions in a dispute resolution section authored by the State that would allow it to hail the Tribe into federal court and seek an order terminating the compact upon a showing that "(i) the respondent party has breached its Compact obligations, and (ii) the respondent party failed to cure the material breach within the time allowed [by the court]." While the State obviously thinks termination is an appropriate *contract* remedy, a *compact* is not just any contract. Rather, here as in the labor context under the NLRA, "the relationship

between the parties is… a continuing one," each party is "bound to deal exclusively with the other," and "there is… public interest in a successful outcome" to the negotiations at issue. 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.26c. Meaning of Fair Dealing, p. 402 (3d ed. 2004); *see* 25 U.S.C. § 2702(1) (explaining the purpose of IGRA is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments"). Thus, the remedies desired by the State for rectifying perceived problems in carrying out the compact should have been more attuned to the identity of the other contracting party, the nature of the relationship, and the purpose of the negotiations.

89. By insisting upon the inclusion of unilateral "violation" and "material breach" language throughout the compact that could lead to the termination of the agreement, the State has failed to negotiate in good faith.

## REFUSING TO CONFINE THE NEGOTIATIONS TO THE GOVERNOR

90. According to Article IV, Section 19(f) of the California Constitution, the "Governor is authorized to *negotiate* and conclude compacts, subject to *ratification* by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally-recognized Indian tribes on Indian lands in California in accordance with federal law." Cal. Const. art. IV, § 19(f) (emphasis added). The term "ratification" is generally understood to mean the "binding adoption of an act already completed," such as "action taken by the legislature to make binding a treaty negotiated by the executive." Black's Law Dictionary 1513 (11th ed. 2019); *see* Webster's New Int'l Dictionary 2066 (2d ed. 1941) (defining "ratify" as "[t]o approve and sanction, esp. formally, as the act of an agent or servant; to make valid or legally operative; to confirm; as, the Senate *ratified* the treaty… .").

91. Bearing in mind the foregoing terminology, Berry Creek sent redlines to the State to ensure there would be no hidden, last-minute pre-conditions for obtaining the legislative ratification of the compact, proposing the following section to the State for inclusion in the compact:

12.11. No External Preconditions to Approval or Ratification, including a Collective Bargaining Agreement

All of the terms required by the State for the approval of this Compact are set forth herein, and thus the State, whether the Office of the Governor, the Legislature, or otherwise,

shall not seek any additional concessions outside of this Compact for its approval or rati-fication.

And yet, the State outright rejected this proposal, explaining that it "does not consider the Tribe's pro-posed addition of section 12.11 appropriate" because "[t]he legislature is a separate and equal branch of State government that exercises Constitutional authority by considering for ratification tribal state gam-ing compacts." In other words, the California Legislature *can* negotiate with an Indian tribe and *does* demand additional concessions outside of the compact for securing the ratification of the agreement. In addition to being patently illegal under State and federal law, this state of affairs would likely create a duress-like situation for Berry Creek in which the Tribe would have to acquiesce to whatever the Cali-fornia Legislature extracontractually demanded on top of the terms in the compact under consideration so the Tribe would not be left without a successor compact on the eve of the June 30, 2022 expiration date of the 1999 Compact.

92. By refusing to consider any of Berry Creek's redlines that would confine the negotiating au-thority to the Governor and the negotiated terms to the compact, the State has failed to negotiate in good faith.

## REFUSING TO CONFINE THE REGULATIONS TO THE COMPACT

93. In keeping with the preceding paragraphs, the compact is supposed to be the mechanism through which a state has a role in the regulation of class III gaming. After all, states do not have civil regulatory authority over Indian reservations (*see California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987)), and the text of IGRA explains that the compact "govern[s] the conduct of gaming ac-tivities" and "may include provisions relating to" the seven topics of negotiation set forth within the stat-ute. 25 U.S.C. §§ 2710(d)(3)(A), (d)(3)(C).

94. And yet, the State is trying to turn the compact into an anachronism, an outmoded vessel through which it can exert general regulatory authority over tribal gaming facilities. To wit, from the inception of the negotiations, the State has insisted upon including escape hatch provisions that would allow the State Gaming Agency to adopt regulations outside of the compact which it would then present for approval, in some circumstances, to an "Association" largely comprised of "two (2) representatives from each tribal gaming agency." In other words, the State has created an unbalanced regulatory body

comprised of the State Gaming Agency on one side and representatives from *all of the* gaming tribes on the other. The State Gaming Agency can then devise a regulation it wants to impose against the tribes outside of the compacts and the Association, at most, collectively votes on whether to approve or dis-approve the regulation. What this means is the compact is creating a situation whereby other tribes who may be prone to capitulate to the rather persuasive State of California have the power to encroach upon Berry Creek's sovereignty and permit the State to civilly regulate outside of the compact. To try and cor-rect this problem, Berry Creek proposed redlines that would allow the State to incorporate the existing State regulations into the compact, while asking the State to use the amendment and/or renegotiation processes in Section 15.0 of the compact – just as the Tribe has to do – to address new issues that may come up during the life of the agreement. However, the State outright rejected Berry Creek's proposal, stating it "cannot agree to this proposed language," as it "would [supposedly] freeze the regulations in time" when "they will need to change over the course of the 25 year term of the Compact."

95. By refusing to consider any of Berry Creek's redlines that would confine the State regula-tions to the compact itself, the State has failed to negotiate in good faith.

**OTHER COMPACT PROVISIONS THAT ARE NOT DIRECTLY RELATED TO THE REGULATION OF CLASS III GAMING**

96. From the inception of the negotiations, the State has insisted upon a slew of other overbroad or extraneous provisions in the compact that would greatly increase the costs of doing business, includ-ing the following:

a) defining the term "Gaming Facility" to include structures and areas other than the casino itself;

b) defining the term "Project" to include undertakings that could also serve the tribal community;

c) requiring Berry Creek to obtain $3,000,000 in per-occurrence insurance coverage for claims by employees of unlawful harassment, retaliation or discrimination, *and* to waive the Tribe's sovereign immunity up to the limit of the policy;

d) requiring Berry Creek to obtain $10,000,000 in per-occurrence insurance coverage for claims of bodily injury, personal injury, and property damage arising out of the operation of the Gaming Facil-ity, and to waive the Tribe's sovereign immunity up to the limit of the policy;

e) prohibiting Berry Creek "from cashing any check drawn against a federal, state, county, or city fund, unless that check is for wages or payment for goods and services;"

f) requiring Berry Creek to comply with the State of California's minimum wage law; and,

g) requiring the enforcement of State "earnings withholding orders for… support of a child, spouse or former spouse."

97. Yet, the list of permissible subjects of negotiation in IGRA only allows States to negotiate over those subjects that are "directly related to the operation of gaming activities," which the foregoing are not. 25 U.S.C. § 2710(d)(3)(C)(vii). On top of which, the State has not offered any concessions – let alone meaningful ones – in order to demand such terms in return. *See*, *e.g.*, *Big Lagoon Rancheria v. California*, 759 F. Supp. 2d 1149, 1162 (N.D. Cal. 2010), *aff'd by* 789 F.3d 947 (9th Cir. 2015) (*en banc*)) (holding that "to negotiate for environmental mitigation measures in good faith, the State must offer a meaningful concession in exchange" (citing *Coyote Valley II*, 331 F.3d at 1116-17)).

98. By insisting upon the inclusion of the foregoing subjects in the compact that are neither directly related to the operation of gaming activities nor counterbalanced by any meaningful consideration, the State has failed to negotiate in good faith irrespective of whether the issues are analyzed individually or collectively.

### FIRST CLAIM FOR RELIEF

### [FAILURE TO NEGOTIATE IN GOOD FAITH – 25 U.S.C. § 2710(d)(7)(A)(i)]

### [AGAINST THE STATE OF CALIFORNIA AND GOVERNOR GAVIN NEWSOM]

99. Berry Creek incorporates by reference the preceding general allegations as if set forth in full.

100. More than one-hundred and eighty (180) days have elapsed since Berry Creek commenced negotiations with the State in February 2018, and yet the parties have failed to enter into a tribal/state compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

101. As detailed in the preceding general allegations, Berry Creek has introduced evidence that the State has failed to respond to the Tribe's request to negotiate a compact in good faith according to the following discreet counts of this First Claim for Relief, irrespective of whether such counts (and conduct raised therein) are considered individually or collectively:

**Count 1:** Failing to offer meaning concessions for its revenue sharing and other extraneous de-

mands;

**Count 2:** Insisting upon the payment of revenue sharing into the SDF to cover costs not directly related to the regulation of Indian gaming (*see*, *e.g.*, ¶¶ 71-73);

**Count 3:** Insisting upon the payment of revenue sharing into the RSTF above and beyond what is needed globally to provide each non- and limited-gaming tribe with $1.1 million of annual financial support (*see*, *e.g.*, ¶¶ 74-76);

**Count 4:** Refusing to negotiate for an enforceable form of exclusivity in the compact (*see*, *e.g.*, ¶¶ 77-79);

**Count 5:** Insisting upon the execution of costly MOUs that evade the Secretarial review process in IGRA every time Berry Creek undertakes a "Project" during the life of the compact (*see*, *e.g.*, ¶¶ 80-83);

**Count 6:** Insisting upon the execution of thirteen pages of State labor laws inaptly known as the TLRO when the NLRA applies to the gaming facilities of Indian tribes and where there is material conflict between these two sets of authorities (*see*, *e.g.*, ¶¶ 84-86);

**Count 7:** Insisting upon littering the compact with violation/material breach language that provides the State with the ability to seek compact termination as a potential remedy (*see*, *e.g.*, ¶¶ 87-89);

**Count 8:** Refusing to confine the negotiations to the Governor and the negotiation demands to the compact itself (*see*, *e.g.*, ¶¶ 90-92);

**Count 9:** Refusing to confine regulatory terms to the compact by allowing the State Gaming Agency to issue civil regulations – over Berry Creek's objections – during the life of the agreement (*see*, *e.g.*, ¶¶ 93-95);

**Count 10:** Insisting upon a slew of other provisions that are not directly related to the operation of gaming activities, such as by a) defining the term "Gaming Facility" to include structures and areas other than the casino itself; b) defining the term "Project" to include undertakings that also could serve the tribal community; c) requiring Berry Creek to obtain $3,000,000 in per-occurrence insurance coverage for claims by employees of unlawful harassment, retaliation or discrimination, *and* to waive the Tribe's sovereign immunity up to the limit of the policy; d) requir-

COMPLAINT OF BERRY CREEK RANCHERIA

ing Berry Creek to obtain $10,000,000 in per-occurrence insurance coverage for claims of bodily injury, personal injury, and property damage arising out of the operation of the Gaming Facility, and to waive the Tribe's sovereign immunity up to the limit of the policy; e) prohibiting Berry Creek "from cashing any check drawn against a federal, state, county, or city fund, unless that check is for wages or payment for goods and services;" f) requiring Berry Creek to comply with the State of California's minimum wage law; and g) requiring the enforcement of the State's "earnings withholding orders for… support of a child, spouse or former spouse" (*see, e.g.*, ¶¶ 96-98);

**Count 11:** Refusing and otherwise failing to negotiate for forms of class III gaming that are allowed to Berry Creek under IGRA – including the specific games requested by the Tribe – on account of the lottery provisions in both Section 19(d) and Section 19(f) of Article IV of the California Constitution (*see, e.g.*, ¶¶ 51-52, 67);

**Count 12:** Refusing and otherwise failing to negotiate for forms of class III gaming that are allowed to Berry Creek under IGRA – including the specific games requested by the Tribe – on account of the cardrooms around the State of California commercially offering tile games (*see, e.g.*, ¶¶ 53-54, 68);

**Count 13:** Refusing and otherwise failing to negotiate for forms of class III gaming that are allowed to Berry Creek under IGRA – including the specific games requested by the Tribe – on account of nonprofits having the statutory authority to operate "controlled games" at fundraisers under Sections 19985 to 19987 of the Business and Professions Code (*see, e.g.*, ¶¶ 55-56, 68);

**Count 14:** Engaging in protectionism by restricting Berry Creek to offering only certain class III gaming games that other public or private entities in the State have (or will have the advance ability to) put into commercial operation first, almost exclusively in urban areas which will in turn remove any incentive for patrons in such locations to frequent the Berry Creek reservation in order to play such games (*see, e.g.*, ¶¶ 2, 68);

**Count 15:** Engaging in surface bargaining generally and with respect to any and all of Berry Creek's requests for new class III gaming rights (*see, e.g.*, ¶¶ 57-69);

**Count 16:** Failing to conduct individualized negotiations and/or imposing improper conditions

upon or otherwise improperly limiting the negotiations (*see*, *e.g.*, ¶¶ 57-69); and,

**Count 17:** Refusing to provide any concessions to counteract the State's discretionary concur-

rence in the two-part determination for Enterprise's off-reservation gaming proposal that enabled

the tribe to leapfrog over Berry Creek and open a Hard Rock casino along one of the two main

patronage lines for Gold Country Casino (*see*, *e.g.*, ¶¶ 35-49, 66).

102. The "burden of proof shall," therefore, "be upon the State to prove that the State has nego-

tiated with [Berry Creek] in good faith to conclude a Tribal-State compact governing the conduct of

gaming activities" (*see* 25 U.S.C. § 2710(d)(7)(B)(ii)), which the State is incapable of carrying since,

*inter alia*, it insisted upon the terms it desired, refused to consider the terms it did not, and never pro-

vided material concessions for any of its demands.

103. This failure to negotiate in good faith by the State thus necessitates a concomitant finding of

such by the Court as well as the triggering of the tripartite remedial process set forth within Section

2710(d)(7)(B) of IGRA that is designed to "expedite" the conclusion of a compact or a compact-like

mechanism. *See* 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *Rincon II*, 602 F.3d at 1041 (explaining the "func-

tion of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrange-

ments on an expedited basis").

## PRAYER FOR RELIEF

WHEREFORE, the Berry Creek Rancheria of Maidu Indians of California prays as follows:

1. That the Court find the State failed to negotiate in good faith under Section 2710(d)(7)(B)(iii)

of IGRA and trigger the statutory remedial process set forth in Section 2710(d)(7)(B)(iii)-(vii).

2. That the Court toll the expiration date of the 1999 Compact and/or enjoin, estop, or otherwise

prevent the State from taking any adverse actions against Berry Creek, its gaming facility, the employ-

ees thereto, or the customers or vendors thereof on account of any supposed violation(s) of the 1999

Compact, IGRA, or other federal or State gaming-related laws if the disposition of this lawsuit or any at-

tendant remedial process continues past the June 30, 2022 expiration date of the 1999 Compact;

3. That the Court award Berry Creek its costs of suit and attorneys' fees as allowed by law or eq-

uity; and,

4. That the Court award any other relief that may be available under the waivers in Section 9.4(a)

1  of the 1999 Compact or Section 98005 of the Government Code as a result of the State's failure to nego-

2  tiate in good faith.

3      RESPECTFULLY SUBMITTED this 12th day of December, 2021

4

5                                                    BERRY CREEK RANCHERIA

6                                                    By: */s/ Kevin M. Cochrane*
                                                     Cheryl A. Williams
7                                                    Kevin M. Cochrane
                                                     caw@williamscochrane.com
8                                                    kmc@williamscochrane.com
                                                     WILLIAMS & COCHRANE, LLP
9                                                    836 57th Street, Suite 472
                                                     Sacramento, CA 95819
10                                                   Telephone: (916) 431-0126

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28